UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                      CASE NO: 2:16-cr-139-FtM-99MRM

CHRISTOPHER JORGE PONCE

_____/

## OPINION AND ORDER[1]

This matter comes before the Court on Defendant Christopher Jorge Ponce's Motion to Suppress (Doc. 32) and the Government's Response in Opposition (Doc. 44). In addition to the parties' briefs, the undersigned held an evidentiary hearing at which Defendant was present and represented by counsel. The Court took the motion under advisement.

## INTRODUCTION

This case started when Ponce violated the terms of his probation and absconded. Law enforcement agents used the global position system ("GPS") on his cell phone to find and arrest him. In the home where Ponce was taking cover, law enforcement found two loaded firearms – a Beretta pistol in Ponce's drawstring backpack, and a Colt .45 pistol under a mattress. Ponce admitted the guns were his before and after waiving his *Miranda* rights. A federal grand jury indicted him for possessing firearms and ammunition

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

as a convicted felon.  (Doc. 1).  Under the Fourth and Fifth Amendments to the United States Constitution Ponce now moves to suppress his post-*Miranda* statements and the firearms and ammunition.

The web of issues in this case is akin to a law school exam.  No sooner is one resolved do several ancillary issues present themselves.  Although Ponce's apprehension and arrest are beset with complications, the Court finds no constitutional violations to warrant suppressing his statements, firearms, or ammunition.

## BACKGROUND

During the evidentiary hearing, Counsel for the Defendant called Ponce to establish standing.  He also introduced one exhibit.  (Doc. 54).  For the Government's part, it called ten witnesses:

- Amber Kruis – probation specialist, Florida Department of Corrections;

- Ebenzer Paikai – Deputy United States Marshal;

- Matthew Fordham – Task Force Officer ("TFO") for the United States Marshal Service ("USMS");

- Gary Bailey –  TFO;

- Richard White – TFO;

- Scott Newbury – TFO;

- Solon Duncan – TFO;

- James Butler – TFO;

- Keith Dunn – TFO; and

- Noah Williams – Special Agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").

(Doc. 49).  The Government also introduced twenty-one exhibits.  (Doc. 55).  Based on this evidence, the Court makes these findings of fact material to Ponce's motion.

Ponce was sentenced to thirty-six months' probation for felony drug possession. (Gov't Exs. 1 & 2).  Conditions of his probation included permitting his probation officer to visit his home, living at the same residential address, answering his probation officer's questions truthfully, not carrying a firearm, and abstaining from illegal drugs.  (Gov't Ex. 2).  The last condition tripped Ponce, as he tested positive for drugs.  (Gov't Ex. 5).  A warrant for his arrest followed.  (Gov't Ex. 6).  The warrant included Ponce's picture, address, cell phone number of 239-265-4870, and other identifying information.  (Gov't Ex. 6 at 3).  A probation officer went to arrest Ponce at his home, but he was not there. Ponce was nowhere to be found for nearly two weeks.

Enter the USMS and its local task force team led by TFO Fordham.  Apprehending Ponce became their responsibility because of Ponce's criminal history and the nature of his probation violation.  TFO Fordham talked to Ponce's mother who disclosed only that her son was living somewhere west of the interstate off Palm Beach Boulevard.  She also said that her son used the phone number on the arrest warrant, which she had programed in her phone, and that she had recently spoken with him.

TFO Fordham applied for a search warrant/order to track Ponce's phone with, among others, GPS.[2]  (Doc. 32-1 at 5).  He requested the following information and records from Metro PCS, Ponce's cell service provider:

---

[2] The full title of Officer Fordham's affidavit, dated October 7, 2016, was "Affidavit for Search Warrant/Order Authorizing the Installation and Use of Pen Register and a Trap and Trace Devices and/or the Release and/or Receipt of Customer Records, Pen Register Data, Cell Site, and Other Information Including Historical and Real-Time GEO-Location, and the Use of a Cell Site Simulator to Locate a Cellular Device."  (Doc. 32-1).

> GEO/Precision Locations (GPS-Locator Tools), and/or E911 locations/Webmap tool, GPS/Geolocations, Real Time Tool, "RTT," Per Call Measurement Data, Mobile Locate Tool (MLT), Range to Tower Measurements, Historical Mobile Locate Tool, Historical E911/Webmap data, Historic Precision Locations, and other location-based measurements of the Target Telephone for the period of the Warrant.

(Doc. 32-1 at 8).  The state court issued a Warrant/Order on October 7, 2016.[3]  (Doc. 32-2; Gov't Ex. 8).

Four days later, task force officers started tracking Ponce's cell phone.  The tracking included "pinging" Ponce's phone every fifteen minutes or so.  After each ping, TFO Fordham received an email from Metro PCS that identified the phone's longitude and latitude coordinates with an accuracy radius measured in meters.  (Gov't Exs. 10, 20-24).  The email also included a Google map hyperlink.  TFO Fordham enlisted TFO White's help to plot and interpret the coordinates.  After four or five pings, they identified Ponce's cell phone to be in one of two homes on Charles Street in Fort Myers, Florida.  (Gov't Exs. 10, 20-24). [4]

From there, TFOs Fordham and White gathered a team of eight to ten officers and headed to Charles Street.  Before meeting the team, they saw a man walking his dog in the Charles Street neighborhood.  The man told TFO Fordham he had not seen Ponce but that 156 Charles Street had frequent traffic and was a suspicious residence.  (Def. Ex. 8).  That address was one of the two homes in which TFO Fordham suspected Ponce's cell phone was located.

---

[3] The state court's search warrant/order also allowed a pen register, trap and trace device, cell cite simulator, historical cell records, and other electronic information for Ponce's cell phone.  Because the evidence at the hearing showed that Ponce was located with GPS location tracking only, the Court will limit its analysis to that technology.
[4] Charles Street is located West of Interstate 75 off Palm Beach Boulevard.

TFOs Fordham and White then met their team for a briefing.  With a plan in place, they set out to execute it.  Officers surrounded 156 Charles Street to ensure Ponce did not escape and for officer safety.  One officer saw a male matching Ponce's description through two side windows of the house.  A second officer identified the male as Ponce and radioed the information.  It was also radioed that children were in the pool behind the house.

With the house surrounded, officers knocked on the front door and announced themselves.  Michael Whitaker and his wife answered.  They stepped outside and confirmed Ponce was inside.  Ponce came to the front door and TFO Solon Duncan handcuffed him.  (Def. Ex. 8).  TFO Duncan stayed with Ponce outside the home while others did a protective sweep inside the home.  TFO Duncan testified that he did not ask Ponce questions, nor did Ponce volunteer any information while they were together.

With Ponce secured and the residence cleared, the Whitakers were asked about weapons in the home.  Mrs. Whitaker said that she had a handgun in her bedroom, which TFO White found.  According to Deputy Marshal Paikai, Mr. Whitaker indicated that he saw Ponce with other weapons in the house.  This is consistent with TFO White's testimony that one of the Whitakers said that he/she saw Ponce with a weapon in the house the day before.  The Whitakers consented to a search of their home for weapons.  This consent included, according Deputy Marshal Paikai, Mr. Whitaker bringing him to Ponce's backpack.  Deputy Marshal Paikai opened the backpack, saw the black Beretta pistol, and yelled "gun" to alert the other officers of a firearm.  (Gov't Ex. 15).  He closed the backpack, removed it from the residence, and secured it in TFO White's car.

Deputy Marshal Paikai thereafter relieved TFO Duncan, who was still with Ponce outside the house about two feet from a tree abutting the structure.  (Def. Ex. 8).  Deputy Marshal Paikai testified that while standing with Ponce, another officer[5] announced that he found a gun.  It is unclear whether this announcement was regarding Mrs. Whitaker's firearm or the Colt .45 pistol found under the Whitakers' mattress in their master bedroom.[6]  (Gov't Ex. 16).  Regardless, Deputy Marshal Paikai testified that upon hearing the officer's gun announcement, Ponce uttered something to the effect of, "they are my guns, my guns.  I bought them."  Deputy Marshal Paikai told Ponce to shut up – expletive language omitted.  He then walked Ponce to TFO Newbury and placed him in the front seat of TFO Newbury's truck.  Deputy Marshal Paikai told TFO Newbury that Ponce admitted that he bought the guns and that Ponce needed to be interviewed.

TFO Newbury started the interview by reading Ponce his *Miranda* rights.  TFO Newbury then asked Ponce questions.  The interview lasted roughly four minutes, and three portions are relevant here.  First is Ponce admitting that he bought the two firearms.  Second is TFO Newbury asking Ponce how much the firearms cost.  When Ponce did not give a price, TFO Newbury indicated how Ponce had before talked about a price.  Only then did Ponce answer he paid $100 for each gun.  Third is that, more than half way through the interview and after Ponce admitted the firearms were his, TFO Newbury asked Ponce why he was carrying the guns.  This prompted Ponce to ask, "Is this going to be used against me in a court of law."  (Gov't Ex. 17).  TFO Newbury replied that he

---

[5] Deputy Marshal Paikai did not know who the officer was that announced finding a gun, but he thought it might have been Officer White.

[6] Before they apprehended him as they approached the home, Officers Bailey and Dunn saw Ponce through the window inside the master bedroom.

was asking questions because they were doing an investigation.  (Gov't Ex. 17).  Ponce then answered that he intended to resell the guns.

In the meantime, Deputy Marshal Paikai called ATF Special Agent Noah Williams because of the firearms.  Before booking Ponce at the jail, Deputy Marshal Paikai drove him to meet Agent Williams and his partner at a local gas station.  Agent Williams and his partner asked Ponce if they needed to reread his *Miranda* rights.  Ponce said no.  Ponce, who was cooperative according to Agent Williams, again admitted that the firearms were his.

A federal grand jury indicted Ponce for possessing the two firearms and ammunition as a convicted felon.  (Doc. 1).  He now moves to suppress to his post-arrest statements, firearms, and ammunition.

## STANDING

Before arguing the motion to suppress, the Government contested Ponce's standing to challenge the searches of his cell phone and backpack.  Standing in this context is a shorthand reference for the threshold determination under the Fourth Amendment of whether Ponce had a legitimate expectation of privacy in the items searched – *i.e.*, the cell phone and backpack.  *See Rakas v. Illinois*, 439 U.S. 128, 134-135 (1978); *United States v. Brazel*, 102 F.3d 1120, 1147-48 (11th Cir. 1997).  And it was Ponce's burden to demonstrate that he had the requisite expectation.  *See United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994).  To do so, Ponce testified at the evidentiary hearing that his cell phone number was 239-265-4870 and that the only device connected to the number was a Samsung smartphone with Internet access and data storage.  He admitted to using the number to contact his family and friends before and at

the time of his arrest.  He also admitted that the backpack, and credit cards therein, was

his.  Based on the uncontested testimony, Ponce established the requisite standing to

bring the motion to suppress.

## DISCUSSION

Ponce presents three independent arguments to support his motion to suppress.

First, he argues that the Warrant/Order to track his cell phone number was invalid.

Second, Ponce asserts that the warrantless search of his drawstring backpack violated

his Fourth Amendment rights because the Whitakers lacked the authority to consent to

its search.  Third, Ponce calls for suppression of his post-*Miranda* statements because

he did not give a valid *Miranda* waiver and the officers engaged in behavior akin to

question first, Mirandize second.  The Court will address each argument in turn.

## A.  Warrant/Order

Before turning to Ponce's arguments on the Warrant/Order, the Court must

address a preliminary matter.  The Government claims that a warrant was never required

to track Ponce's cell phone because Ponce was a state probationer required to disclose

his location upon request and a fugitive subject to a valid arrest warrant, and had no

expectation of privacy in his location.  The Court will start with the primary question raised

by the Government – whether a warrant was required to use GPS tracking on Ponce's

cell phone.

### 1.  Warrant requirement for GPS tracking

The Fourth Amendment protects the "right of the people to be secure in their

persons, houses, papers, and effects against unreasonable searches and seizures."  U.S.

Const. amend. IV.  The government conducts a "search" when it intrudes on a person's

"reasonable expectation of privacy." *Katz v. United States* 389 U.S. 347, 360 (1967) (Harlan J., concurring) (finding a Fourth Amendment violation in attaching an eavesdropping device to a public telephone booth).[7]

Ponce argues that a valid warrant was needed to use GPS location tracking on his phone.  Implied in Ponce's argument is that he had a reasonable expectation of privacy in his location.  The Government maintains that Ponce enjoyed no such privacy because he was on probation.  Because of Ponce's probationer status, the Government asserts that it needed only a reasonable suspicion – not probable cause – to find Ponce with GPS tracking.  To the Government, no probable cause means no warrant needed.  The Government relies on *United States v. Knights*, 534 U.S. 112 (2001) and *United States v. Yuknavich*, 419 F.3d 1302 (11th Cir. 2005) for its argument.

In *Knights*, the Supreme Court examined whether a warrantless search pursuant to a probation condition, and supported by reasonable suspicion, satisfied the Fourth Amendment.  534 U.S. at 114.  "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other hand, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at 118-19 (citation omitted).  The Court reasoned that defendant's "status as a probationer subject to a search condition inform[ed] both sides of that balance." *Id.* at 119.  And "[i]nherent in the very nature of probation is that probationers do not enjoy

---

[7] A search also occurs when the government physically trespasses on an individual's person, house, papers, or effects *See United States v. Jones*, 565 U.S. 400, 404-06 (2012) (holding GPS tracking of a vehicle for twenty-eight days was a search when agents physically trespassed upon the vehicle to install the tracking device).  There has been no argument here of a physical trespass.

the absolute liberty to which every citizen is entitled." *Id.* (internal quotations and citations omitted). From there the Court found, "[w]hen an officer has reasonable suspicion that a probationer subject to search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121.

In *Yuknavich*, the Eleventh Circuit extended *Knights* to a situation in which no warrantless search condition was present as part of the defendant's probation. 419 F.3d at 1309-11. The defendant/probationer was a sex-offender subjected to restricted internet use. *Id.* at 1304-05. He was detained for violating this condition and later challenged the probation officers' warrantless search of his computer as unconstitutional. Relying on *Knights*, the Eleventh Circuit found that no more than reasonable suspicion was needed for the search. *Id.* at 1311. The court was not deterred by the lack of a search condition: "the presence of a search condition is but one 'salient circumstance' to consider." *Id.* at 1309 (citations omitted). From there, the court stated,

> [the defendant's] Internet usage was explicitly restricted to "work related purposes" during "work hours." Given this limitation, [the defendant] should have always been prepared for three questions: Do you have a computer? If yes, can you access the Internet? If yes, what are you doing on-line? Not only should he have been prepared to answer those questions, but he also should have been prepared for the officers to conduct their own research to find the answers. If the Internet restriction did not provide the officers with a greater ability to examine the life of [the defendant], then there would be little reason for it to exist.

*Id.* at 1310. The court then found reasonable suspicion to search defendant's computer because of him twice accessing the internet outside of his home, his nervous appearance and delay in answering the door, and a modem connected to one of his computers.

Like in *Yukanvich*, Ponce's probation conditions did not include warrantless searches.  However, the rationale used by the Eleventh Circuit in that case has no application here.  Ponce's probation conditions included permitting his probation officer to visit his home, remaining in a specified place, answering the officer's questions truthfully, not carrying a firearm, and refraining from drug use.  (Gov't Ex. 2).  The search of Ponce's cell phone is wholly detached from those conditions.  Unlike *Yuknavich*, there is nothing implicit in Ponce's probation terms to prepare him for a warrantless search of his cell phone.  The Court is hard pressed to see how Ponce's probation limitations meant he should have been prepared for officers to track his whereabouts at any given time through electronic surveillance.

This victory for Ponce is illusory.  The Government still prevails because Ponce's fugitive status – not his probation status – is determinative.  On this point, the Court finds illustrative the concurrence in *United States v. Riley*, 858 F.3d 1012 (6th Cir. 2017) (Boggs J., concurring) (*per curiam*).  In *Riley*, the court was called upon "to clarify the rules by which police may seek to find miscreants: When a fugitive subject to an arrest warrant for armed robbery hides in a motel, may the government track his cell phone's GPS coordinates to locate and arrest him?"  *Id.* at 1013.

*Riley* is factually similar to this case.  There, a state court issued an arrest warrant for defendant.  Two days later, he bought a cell phone serviced by AT&T.  *Id.* at 1014.  Defendant's girlfriend disclosed the number to a special deputy marshal, who applied for and received an order compelling AT&T to produce records of defendant's phone under federal electronic surveillance laws.  *Id.* (citing 18 U.S.C. §§ 2703, 3123, 3124).  The order

compelled AT&T to disclose, among other things, real-time tracking of the latitude and longitude coordinates of defendant's phone. *Id.*

Hours later, the USMS received real-time GPS data that defendant's phone was at a specific motel. *Id.* Officers went to the motel, showed the front-desk clerk defendant's picture, and learned his room number. *Id.* at 1014-15. The officers knocked on the room door and arrested defendant when he answered. They found a pistol in plain view, which lead to defendant's indictment for possessing a firearm as a convicted felon. *Id.* at 1015. He moved to suppress the pistol as the fruit of an unconstitutional search, arguing that the GPS tracking intruded on his reasonable expectation of privacy and thus required a search warrant. *Id.* (footnote omitted).

The majority found that "the government did not conduct a search under the Fourth Amendment when it tracked the real-time GPS coordinates of [defendant's] cell phone on the date of [his] arrest." *Id.* at 1018. It explained, "using seven hours of GPS location data to determine an individual's location (or a cell phone's location), so long as the tracking does not reveal movements *within* the home (or hotel room), does not cross the sacred threshold of the home, and thus cannot amount to a Fourth Amendment search." *Id.* (emphasis original).

The concurrence offered defendant's fugitive status as an additional reason for no Fourth Amendment violation. *Id.* at 1020. The government had tracked defendant's cell phone only after a judge issued a valid arrest warrant. This meant defendant was a fugitive subject to an arrest warrant and not merely a suspect in a criminal investigation. This fact distinguished defendant's situation from other Supreme Court cases. *Id.*

The concurrence turned to *Payton v. New York*, 445 U.S. 573 (1980) for support that "individuals on the run from arrest warrants have a diminished expectation of privacy." *Id.* A quick review of *Payton* is needed. In that case, the Supreme Court held that law enforcement officers could enter the home of an individual subject to an arrest warrant without first obtaining a search warrant if the officers reasonably suspected the individual to be inside. *Payton*, 445 U.S. at 592-96. Based on *Payton*, the concurrence reasoned,

> if the issuance of a valid arrest warrant may reasonably require an individual to open the doors of his *home*, which stands at the 'very core' of Fourth Amendment protection . . . , then it may reasonably require the same individual to open the doors of his *phone* – at least so far as to disclose the longitude and latitude coordinates emitted by a phone that the individual choose to carry and turn on.

*Riley*, 858 F.3d at 1020 (internal quotation and citation omitted) (emphasis original). In the end, the concurrence concluded, "so long as a valid arrest warrant has been issued, law enforcement officers who reasonably suspect that a cell phone is in the possession of the subject of the warrant may track that cell phone's location in order to facilitate the execution of the warrant, without implicating the Fourth Amendment." *Id.*

Neither *Riley*'s majority nor concurrence opinions are binding precedent here. Their logic is nevertheless sound. Ponce was subject to a valid arrest warrant for violating probation. (Gov't Ex. 6). He absconded and disappeared for over two weeks. USMS entered the picture to find and arrest Ponce. It is against this backdrop they tracked Ponce's phone using GPS. TFO Fordham had, at a minimum, reasonable suspicion that Ponce was using the cell phone number he provided to his probation officer during that time. TFO Fordham also talked to Ponce's mother who confirmed that her son used the number on the arrest warrant, that she programed that number on her phone under his

name, and that she recently talked to him.  The USMS used the GPS location tracking to facilitate Ponce's arrest.  Armed with the arrest warrant and reasonable suspicion that Ponce used the cell phone number, law enforcement did not need a search warrant to use GPS location tracking on Ponce's phone.[8]  Ponce presents no arguments or case law to find otherwise.  Under the facts of this case, the GPS location tracking did not contravene Ponce's Fourth Amendment rights.

Accordingly, the Court denies Ponce's motion to the extent he moves to suppress the firearms, ammunition, and statements as poisonous fruit of the GPS location tracking. The Court's discussion will not end there, however, because law enforcement took the prudent step of obtaining a Warrant/Order.  As explained below, the Court finds that the Warrant/Order passes Fourth Amendment scrutiny and likewise affords justification for the GPS search.

### 2. *Probable cause and particularity*

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Here, Ponce argues that the Warrant/Order is invalid because it lacks particularity and probable cause. The Court will start with whether TFO Fordham's affidavit underlying the Warrant/Order lacked signs of probable cause and that the judge's belief in its validity when it was issued was entirely unreasonable.  *See United States v. Leon*, 468 U.S. 897, 922 (1984).

---

[8] *Cf. United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (en banc) (holding there is no Fourth Amendment protection for historical cell-site location data records from cell service providers).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). To avoid "rigid" legal rules, courts use a totality of the circumstances test. *See Gates*, 462 U.S. at 233. "The task of the magistrate issuing a warrant is to make a practical, common-sense decision whether, given all the circumstances set forth in the probable cause affidavit, there is a fair probability that evidence of a crime will be found in a particular place." *United States v. Bishop*, No. 15-15406, 2017 WL 1208403, at *5 (11th Cir. Apr. 3, 2017) (citing *Gates*, 462 U.S. at 238). "And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." *Gates*, 462 U.S. at 238-39) (internal quotations and citation omitted). Of course, "[a]n affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause," and "wholly conclusory" statements do not meet the probable cause requirement. *See id.* at 239. "For probable cause to exist, . . . the information supporting the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant." *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) (citations omitted).

Ponce argues that the affidavit underlying the Warrant/Order lacks specific dates to establish freshness of the information and facts connecting Ponce to the cell phone number. The Court disagrees. The affidavit states the USMS entered the search for Ponce on September 28. TFO Fordham applied for the warrant/order seven days later. During that time, he learned that Ponce "had been using [the cell phone number] to communicate with friends and family." (Doc. 32-1 at 3). Further, an "investigative database" confirmed that Ponce had supplied the phone number as his. (Doc. 32-1 at 3).

Reading this information together provides a substantial basis that Ponce was using, and would continue to use, the cell phone number around the time of his arrest.  Any other reading would be hyper-technical and defy common sense.

The affidavit also recounted that Ponce violated his probation, which prompted the arrest warrant on September 22.  It relayed "efforts to date" to find Ponce were unsuccessful.  Coupling this information with the details on Ponce's cell phone number provided probable cause that finding the phone would lead to apprehending Ponce.  The Court, therefore, finds that the Warrant/Order satisfies the Fourth Amendment's probable cause requirement.

The Court turns next to the Fourth Amendment's particularity requirement.  Ponce takes issue that the Warrant/Order allowed law enforcement to search a cell phone number, and not a hand-held device, residence, or some other premises.  (Doc. 32 at 18-19).  He also raises a hypothetical concern that the cell phone number could have been attached to multiple devices, some of which other people possessed.  So in effect, Ponce asserts, the Warrant/Order authorized the search of numerous devices reachable by that phone number.  (Doc. 32 at 20).

As stated, the Fourth Amendment requires a search warrant to describe particularly the place to be searched and the things to be seized.   U.S. Const. amend. IV.  A search warrant's "description is sufficiently particular when it enables the searcher reasonably to ascertain and identify the things to be seized."  *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985).  Courts apply the Fourth Amendment's particularity requirement "with a practical margin of flexibility, depending on the type of property to be seized."  *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982).  Thus, in

determining the sufficiency of a warrant's description, courts consider whether the description "is as specific as the circumstances and nature of activity under investigation permit." *Id.*   "A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad." *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2009).  But, "elaborate specificity in a warrant is unnecessary" to satisfy the particularity requirement. *United States v. Peagler*, 847 F.2d 756, 757 (11th Cir. 1988).

Here, the Court rejects Ponce's contention that the Warrant/Order was not particular because it described a cell phone number, and not a device.  At the time of the investigation, TFO Fordham knew of Ponce's cell phone number and that Metro PCS was the service provider.  The majority of the cell cite location records sought through the Warrant/ Order required a cell phone number – not a device.  And the scope of the Warrant/Order was restricted to searching Ponce's cell phone number for evidence of his location and permitted no free-ranging search of its contents. *See generally Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("The manifest purpose of th[e] particularity requirement was to prevent general searches.").  Nor did it authorize a search for evidence of general criminal activity.  It limited the search to evidence linked to Ponce's potential whereabouts.

Accordingly, the Court finds the Warrant/Order to satisfy the Fourth Amendment's particularity requirement.

### 3.  Good faith exception

Even if the Warrant/Order lacked probable cause, the Court finds the *Leon* good faith exception applies to prevent suppression of the firearms, ammunition, and Ponce's statements.   Evidence obtained because of an illegal search must be excluded in

subsequent criminal prosecutions.  *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). The exclusionary rule, as it is known, is a judicially created remedy designed to deter future Fourth Amendment violations.  *See United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002).  One exception to the exclusionary rule is the *Leon* good faith exception.

Under the Supreme Court's decision in *United States v. Leon*, courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant ultimately found to be unsupported by probable cause. 468 U.S. 897, 922 (1984).  The *Leon* good faith exception applies in all but four limited circumstances, two of which Ponce argues here: (a) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (b) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid."  *Martin*, 297 F.3d at 1313 (internal quotations and citations omitted).  "The *Leon* good faith exception requires suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not harbored an objectively reasonable belief in the existence of probable cause.'"  *Id.* (citation omitted).  Considering the Court's analysis of the Warrant/Order's probable cause and particularity, it is clear this case does not fall into either circumstance to bar the *Leon* good faith exception.

Because neither exception to the *Leon* good faith exception applies in this case, the Court must decide whether TFO Fordham reasonably relied upon the search warrant. "The good faith exception requires the court to consider whether a reasonably well-trained officer would know that the warrant was illegal despite the magistrate's authorization."  *Id.*

at 1318.  Here, the record indicates that Officer Fordham's conduct in executing the Warrant/Order was objectively reasonable.  The supporting affidavit provided ample indicia of probable cause.  It set forth details that Ponce violated his probation, absconded, and could not be located for nearly two weeks.  It also indicated that family members said he had been using the cell phone number.  In addition, Ponce was arrested within two hours of the GPS tracking starting, which makes the Warrant/Order reasonable.  Because of these factual representations, the resulting warrant was not facially invalid and it was not unreasonable for the officers to rely on it.  In addition, "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis v. United States*, 56 U.S. 229, 232 (2011). There is no Eleventh Circuit or Supreme Court case directly on point to the issue at hand.

Finally, to the extent Ponce claims that the Warrant/Order did not provide the USMS authority for GPS tracking, that argument is easily disposed of.  The Warrant/Order authorized the USMS to install and use, or cause to install and use, such equipment as to obtain

> GEO/Precision Locations (GPS-Locator Tools), Global Position System (GPS)/Geolocations, E911 locations/Webmap Tool, Precision Location, Mobile Locate Tool, Range to Tower Measurements, Per Call Measurement Data, Real Time Tool, and other location-based measures of the Target Telephone, for a period of sixty (60) days from the d ate of this Warrant, without geographic limitation, and further that the Service Provider(s) is directed to provide all lawful assistance and to initiate a signal (E-911 locator) to determine the location of the Target Telephone on the Service Provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the Investigating Agency serving this Warrant[.]

(Doc. 32-2 at 4-5, ¶ 4).  The latter half of that provision forecloses Ponce's argument.

For all of the above reasons, the Court finds the GPS location tracking to satisfy the Fourth Amendment.  The Court, therefore, denies Ponce's motion to suppress on the ground that the Warrant/Order was invalid.

## B.  Search of 156 Charles Street

The search of 156 Charles Street unearthed the two firearms that Ponce is charged with possessing.  The Beretta pistol was found in Ponce's drawstring backpack, while the Colt .45 pistol was found under the mattress in the Whitakers' bedroom.  The Whitakers consented to the USMS searching their home – a fact that Ponce does not challenge.  And the Whitakers had the authority to consent to the search of their bedroom, including under their mattress where Ponce hid the Colt .45 pistol.

Ponce thus argues that the Whitakers had no authority to consent to Deputy Marshal Paikai searching his backpack.  Generally, Ponce's argument would be true.  But there is a key distinction – Ponce was a probationer whose condition of probation forbid him to possess any firearms.  *See Knights*, 534 U.S. at 114*; Yukanvich*, 419 F.3d at 118-19.  For the search of the backpack, the *Knights* test, discussed *supra*, balances in favor of reasonableness.   Ponce's probation conditions included prohibiting him from possessing a firearm.  Thus, it is reasonable that an officer, probation or otherwise, would inquire if Ponce had a gun and that a search may follow.  *See Yuknavich*, 419 F.3d at 1310 (stating "[i]f the [defendant's] Internet restriction did not provide the officers with a greater ability to examine the life of [the defendant], then there would be little reason for it to exist").

And there was certainly reasonable suspicion to suspect a firearm in the backpack based on the USMS' conversation with the Whitakers.  *See Knights*, 534 U.S. at 121

(stating reasonable suspicion is satisfied when there is "a sufficiently high probability that criminal conduct is occurring to make the intrusion under the circumstances").  Michael Whitaker directly told Deputy Marshal Paikai he saw a firearm in Ponce's backpack.  This gave Deputy Marshal Paikai reasonable suspicion, if not probable cause, to open the backpack.

Accordingly, the Court denies Ponce's motion to suppress as to the search of his drawstring backpack found inside 156 Charles Street.

## C.  Post-*Miranda* statements

Ponce attacks his post-*Miranda* statements on two legal grounds – an invalid waiver and the "question first" technique.  The Court will address each in turn.

*Miranda* requires that law enforcement officers advise a person who is subject to custodial interrogation about certain rights.  *See United States v. Bernal-Benitez*, 594 F.3d 1303, 1317-18 (11th Cir. 2010).  A defendant may waive his *Miranda* rights, "but only if the waiver is made voluntarily, knowingly and intelligently."  *Id.* (quotation omitted).  Based on the "totality of the circumstance surrounding the interrogation," the court must conclude the *Miranda* waiver resulted from a "free and deliberate choice rather than intimidation, coercion, or deception," and was "made with a full awareness of both the nature of the right being abandoned and the consequences of th[at] decision."  *Id.* (quotation omitted).  The government bears the burden of proving by a preponderance of the evidence that a defendant effectively waived his *Miranda* rights.  *Id.*

Here, Ponce argues that he *made no verbal waiver of his Miranda* rights.  This argument, raised for the first time at the evidentiary hearing, is based on the audio recording of his interview, (Gov't Ex. 17), for which he claims a verbal waiver is not

audible.  During the hearing, the Court believed that it heard Ponce give a verbal waiver.  The Court has since re-listened to the recording, heard Ponce give an oral affirmative, albeit low and muffled.  This finding is consistent with TFO Newbury testifying that he recalled Ponce giving a verbal waiver of his *Miranda* rights.  TFO Newbury also testified that if Ponce had not given a response – verbal or non-verbal – that he would not have continued questioning Ponce.  TFO Newbury's recollection is further consistent with TFO White's testimony that Ponce waived his *Miranda* rights.

Ponce's *Miranda* challenge does not end there.  More than half way through the four-minute interview and after Ponce admitted the firearms were his, TFO Newbury asked Ponce why he was carrying the guns.  This prompted Ponce to ask, "Is this going to be used against me in a court of law."  (Gov't Ex. 17).  TFO Newbury replied that he was asking questions because they were doing an investigation.  (Gov't Ex. 17).  Ponce then answered that he intended to resell the guns.  Ponce argues that his question to TFO Newbury and TFO Newbury's response negated any *Miranda* waiver.  The Court disagrees.  First, Ponce's cited case law is inapplicable because this is not a situation in which TFO Newbury made a statement that contradicted or diminished his *Miranda* warnings.  TFO Newbury's response was hardly akin to a detective telling a defendant that signing a *Miranda* waiver form would not hurt.  *See, e.g., United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991); *Hart v. Attorney General of Florida*, 323 F.3d 884, 893-94 (11th Cir. 2003).  Second, Ponce's question did not amount to him wishing to remain silent.  *See Miranda*, 384 U.S. 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wished to remain silent, his interrogation must

cease.").   At bottom, the record shows nothing but Ponce's *Miranda* waiver being knowing, voluntary, and intelligent.

Next, Ponce argues in his brief that the officers intentionally failed to give him *Miranda* warnings before questioning him.  He bases this argument on TFO Newbury asking Ponce, post-*Miranda*, how much the firearms cost.  When Ponce gave no price, TFO Newbury indicated how Ponce had before talked about a price.  Then Ponce answered that he paid $100 for each gun.  Based on TFO Newbury's question, Ponce argues that the recorded interview was little more than a documentation of a prior unwarned, unrecorded interview.

In *Missouri v. Seibert*, the Supreme Court examined "a police protocol for custodial interrogation that call[ed] for giving no warnings of the rights to silence and counsel until interrogation has produced a confession," following the confession with *Miranda* warnings, and "lead[ing] the suspect to cover the same ground a second time." 542 U.S. 600, 604 (2004).  In *Seibert*, an officer questioned the defendant at the police station without *Miranda* warnings and garnered a confession.  She was given a twenty-minute break before the officers gave her *Miranda* rights and obtained a signed waiver.  *Id.* at 605.  The police resumed questioning, leading her back through her earlier admissions. *Id.*  The questioning officer testified that he made a "conscious decision" to withhold *Miranda* rights and employed the question first, give *Miranda* warnings second technique he had been taught.  *Id.* at 605-06.  The Court found that the "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement."  *Id.* at 604.  It thus found her post-*Miranda* confession to be inadmissible.  *Id.*

Here, there was no evidence or testimony that Ponce was ever questioned or interviewed before receiving his *Miranda* rights.  Only four officers testified to speaking with Ponce – Deputy Marshal Paikai, TFO Newbury, TFO White, and Agent Williams. Deputy Marshal Paikai heard Ponce's excited utterance.  Upon hearing Ponce, Deputy Marshal Paikai told him to be silent.  From there, TFOs Newbury and White interviewed Ponce after reading the *Miranda* rights.  Other than TFO Newbury's offhand comment about Ponce previously indicating the price he paid for the gun, there is not even a hint that Ponce was questioned before the *Miranda* warnings.

Accordingly, the Court denies Ponce's motion to suppress as to *Miranda* violations.

## D.  Conclusion

The Court finds no grounds to warrant suppressing Ponce's statements and the firearms and ammunition.  It, therefore, denies his motion to suppress.

Accordingly, it is now

**ORDERED:**

Defendant Christopher Jorge Ponce's Motion to Suppress (Doc. 32) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this July 31, 2017.

**SHERI POLSTER CHAPPELL**
**UNITED STATES DISTRICT JUDGE**

Copies:  Counsel of Record